UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 23 CR 244 |
| v. | ) | |
| | ) | Judge Steven C. Seeger |
| ANTHONY ELLIS | ) | |

**GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

The Court should deny defendant's motion to suppress. (D. 21.) On March 1, 2023, officers using POD cameras observed defendant, over the course of nearly an hour, engage in several hand-to-hand transactions from his SUV, consistent with drug dealing. Officers drove to the area and stopped two men who purchased drugs from defendant. Both men confirmed they had recently purchased drugs, and officers recovered those drugs. Officers then stopped defendant, recovered over $4,000 from him, and arrested him. Pursuant to CPD policy, officers impounded the SUV, drove it to the 11th District station, and searched the vehicle. In hidden compartments, officers recovered a loaded handgun and almost 100 individually packaged baggies of cocaine and heroin. Based on these facts and the credible testimony of officers, the Court should deny defendant's motion. Officers had probable cause to arrest defendant, and they reasonably impounded his SUV and searched it pursuant to the automobile and inventory exception.

1

I.     PROCEDURAL BACKGROUND

On April 20, 2023, the grand jury indicted defendant for two counts of distributing fentanyl and cocaine and one count of being a felon in possession of a gun. Dkt. 1. On July 25, 2023, defendant filed a motion to suppress. Dkt. 21. After delays due to the appointment of new defense counsel, the parties completed briefing on the motion to suppress on February 21, 2024. Dkt. 47. On August 12 and September 12, 2024, the Court held an evidentiary hearing on the motion to suppress. Dkt. 54, 56. After the hearing, defense counsel requested the opportunity to order transcripts and file post-hearing briefs. Dkt. 56. Defense counsel did not order transcripts for several months, and as a result, the Court ordered the parties to file post-hearing briefs without transcripts. Dkt. 60. In its initial response to the motion to suppress, the government provided a factual background with citations to the relevant video footage and police reports. Dkt. 41 at 2-8. The government incorporates its previous factual background by reference and summarizes, to the best of counsel's recollection, the testimony and evidence presented at the evidentiary hearing.

II.     FACTUAL BACKGROUND

Officer Monica Hernandez testified that on March 1, 2023, at about 9 a.m., using POD camera surveillance, she and other CPD officers observed a grey Dodge Durango (the "Durango") park on Springfield Avenue near an alley between Wilcox and Monroe. Ex. A, POD Footage. She observed defendant, wearing a red track suit, exit the Durango, and over the next approximately 50 minutes, she observed

2

defendant engage in several hand-to-hand transactions with apparent drug purchasers. *Id.* at 9:11–10:00. Specifically, Officer Hernandez testified that she observed defendant direct individuals to line up in a nearby alley, repeatedly enter the front passenger seat of the Durango, exit the Durango with small plastic baggies in his hands, move in the alley where he handed baggies to individuals, and then return to the Durango with what appeared to be cash in his hands. *Id.* at 9:15–9:50.

Based on her experience as a police officer and multiple prior instances where she correctly identified conduct she observed as drug dealing, Officer Hernandez believed defendant was dealing drugs out of the Durango. She also testified that, in her experience, to avoid getting caught by law enforcement, drug dealers often stash their drugs in one location, like a vehicle, and then distribute the drugs in another less visible location, like an alley.

Officer Hernandez testified that two other officers, Officers Beesley and Gonzalez, also observed defendant's drug dealing on POD cameras. Officers Beesley and Hernandez testified that while she continued to observe the POD cameras from the police station, Officers Beesley and Gonzalez drove to defendant's location to investigate further. Both officers testified that they remained in communication by phone throughout the investigation and that Officer Hernandez relayed her observations on POD camera to Officer Beesley in the field in real time.

While Officers Beesley and Gonzalez were near defendant's location, Officer Hernandez informed them that she had observed defendant engage in an apparent

3

drug transaction with a man who got into a Cadillac sedan, and she provided a description and location of the Cadillac. Officer Beesley testified that based on her description, he then stopped the Cadillac and recovered small capsules consistent with drugs from Individual A. Ex. B, Beesley BWC 1. As shown on BWC, Individual A confirmed that he had recently purchased the drugs from a person wearing all red. *Id.* at 2:10-4:00. After learning Individual A had cancer, Officer Beesley released him and referred him to drug treatment. *Id.* 4:45-9:00.

Officer Hernandez then informed Officer Beesley that she had observed another apparent drug transaction between defendant and Individual B, who was wearing a leather jacket with white sleeves. Ex. A at 9:39-41. She directed Officer Beesley to Individual B's location and provided a description, and Officer Beesley detained Individual B and recovered drugs from him. Ex. C, Beesley BWC 2 at 3:00-4:00. Individual B admitted that he had just purchased the drugs and stated that the person that sold him the drugs had blue pants, was in a grey truck, was parked near an alley by Wilcox, and had instructed him to go into the alley to wait to be given the drugs. *Id.* 4:00-50. Officer Beesley testified that although Individual B's description of the drug seller was imperfect, based on Officer Hernandez's observation of the drug transaction and Officer Beesley's arrest of Individual B minutes later, he believed Individual B had purchased drugs from defendant.

Officers Beesley and Gonzalez then drove back to defendant's location. As they approached defendant, they observed that he had cash in his hands. Ex. D, Gonzalez

4

BWC 1:50-2:00. Officer Beesley testified that, at this time, based on officers' observation of defendant appearing to deal drugs for over 40 minutes, the two arrests of individuals who had been observed engaging in transactions with defendant and the recovery of drugs from those individuals, the individuals' statements about purchasing the drugs, and his observation of large amounts of cash in defendant's hands, he believed defendant had been dealing drugs out of his Durango.

Officer Gonzalez searched defendant, recovered $1,525 in cash, and detained him. *Id.* at 1:50–2:30. Officer Beesley then conducted a brief search of the Durango and recovered a jacket in the driver's seat containing defendant's driver's license and $2,680 in cash. Officer Beesley testified that, based on his own observations and what Officer Hernandez had reported to him, he suspected there were drugs in the Durango and that the cash was drug proceeds, but that he did not find any drugs in his initial search. As shown on BWC, defendant confirmed that the Durango was his car, and officers did not observe (and defendant did not identify) anyone else nearby the vehicle. Ex. E, Beesley BWC 3 4:00–15. Officers placed defendant under arrest and drove the Durango to the 11th District police station. Officer Beesley testified, in his experience as a police officer, drugs are often found in hidden compartments in vehicles. He testified that he drove the car to the 11th District because he did not think it was safe to leave a car that likely had drugs inside of it on a public street where someone could access it and because he believed the car itself had evidentiary value since it had been used to sell illegal drugs.

5

Once the Durango was securely parked at the 11th District Station, Officer Beesley conducted an inventory search of the Durango. As shown on his body worn camera footage, Officer Beesley discovered a hidden compartment under the passenger side window controls that contained 76 zip lock bags containing white rock-like substances and 22 clear capsules with tan powder. Ex. G,[1] Beesley BWC 4 1:45–2:15. In a matching compartment under the driver-side controls, Officer Beesley recovered a loaded Glock 19 semi-automatic pistol. Ex. I, Beesley BWC 5 1:30–3:45.

## III. ARGUMENT

### A. Officers Had Probable Cause to Arrest Defendant

Probable cause to arrest exists when "a reasonable person, knowing all of the facts and circumstances known to the officer, would believe that the individual in question has committed or is committing a crime." *United States v. Cherry*, 920 F.3d 1126, 1133 (7th Cir. 2019). Probable cause requires only "a probability or substantial chance [that] criminal activity exists." *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056-57 (7th Cir. 2011). Officers "are entitled to draw reasonable inferences based on their training and experience in" determining whether probable cause exists. *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010).

---

[1] In its pre-hearing response to defendant's suppression motion, the government cited 11 exhibits, including arrest reports and lab tests. Dkt. 41. In this brief, the government cites only the video exhibits shown during the hearing. In the interest of consistency, however, the government maintained the exhibit naming conventions from its first response, and as such, certain exhibits letters are skipped in this brief (e.g. there is no Exhibit F.)

6

When officers are in communication with each other, probable cause to arrest may be based on the collective knowledge of multiple officers, so long as "(1) the officer taking the action [ ] act[s] in objective reliance on the information received, (2) the officer providing the information . . . [has] facts supporting the level of suspicion required, and (3) the stop [is] no more intrusive than would have been permissible for the officer requesting it." *Id.* at 252-53. Such collective knowledge "may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed." *Torry v. City of Chi.*, 932 F.3d 579, 586 (7th Cir. 2019).

Defendant does not contend that there were no facts supporting probable cause for his arrest. He contends instead that that Officers Beesley and Gonzalez did not personally observe defendant's criminal activity and because Officer Hernandez did not communicate her observations to them. Dkt. 21 at 5-7. This argument misstates the facts and was directly contradicted by the officers' testimony.

Defendant first claims, without evidence, that Officers Beesley and Gonzalez were "on patrol, making other arrests," on the morning of March 1. Dkt. 21 at 3. Contrary to defendant's claims, however, Officer Beesley testified that he and Officer Gonzalez were both at the 11th District station when POD cameras captured defendant dealing drugs out of his Durango. Officer Beesley testified that they themselves observed defendant engage in repeated transactions consistent with drug dealing. Officers Beesley and Gonzalez then relocated to the scene to investigate

7

further, but Officers Beesley and Gonzalez's first-hand observation of defendant's appearance and suspected drug dealing provided context for their ongoing conversations with Officer Hernandez, who testified that she remained at the station observing defendant.

Additionally, contrary to defendant's claim, Officers Beesley and Hernandez both testified that they remained in communication by phone throughout the investigation. Indeed, Officer Hernandez testified that she informed Officers Beesley and Gonzalez in real time as she observed Individuals A and B engage in apparent drug transactions with defendant. Both interactions were captured clearly on POD footage. Ex. A at 9:29-31, 9:40. Officer Beesley testified that, based on Officer Hernandez's observations and descriptions, he detained Individuals A and B and recovered drugs from both men. While Individual A and B did not offer abundant or perfect details about the person from whom they purchased drugs, Individual A did confirm that he had purchased drugs from a person wearing all red, and Individual B confirmed that he had purchased drugs from a person using a grey truck parked near an alley off Wilcox.

Despite Individual B mistakenly stating that defendant was wearing blue pants, the other details provided were consistent with all three officers' observations. More importantly, regardless of Individual B' description, Officer Hernandez had just four minutes earlier observed Individual B engage in a suspect drug transaction with defendant and reported her observations to Beesley and Gonzalez. Individual B was

8

mistaken about the blue pants, but officers knew (and had video evidence) that it was defendant who sold Individual B, and Individual A, the drugs. *See, e.g.*, *United States v. Adair*, 925 F.3d 931, 936 (7th Cir. 2019) ("[T]he Fourth Amendment d[oes] not require" an officer, upon noting an inconsistency in a witness's claim, "to disregard information" that otherwise supports a stop).

Based on these facts—Officers Beesley and Gonzalez's first-hand observations on POD camera, Officer Hernandez's observations and communication with Officers Beesley and Gonzalez, their objective reliance on her reports, and their own investigation recovering drugs from purchasers—officers had probable cause to arrest defendant. *See United States v. Garrett*, No. 18-CR-00849, 2020 WL 5076717, at *2 (N.D. Ill. Aug. 27, 2020) (probable cause existed based on POD surveillance officer informing arresting officers that he had seen defendant with a gun); *Chalmers v. City of Chi.*, No. 21 CV 1531, 2023 WL 2538962, at *12 (N.D. Ill. Mar. 16, 2023) (probable cause where officers knew POD surveillance officer had observed suspected drug transaction, had description of suspected seller and purchaser, and interacted with purchaser who informed them that he had purchased suspected drugs from seller); *United States v. Sands*, 815 F.3d 1057, 1062–63 (7th Cir. 2015) (probable cause to arrest where one officer informed arresting officer that he observed suspected drug transaction in a car and arresting officer arrested defendant and searched the car).

Defendant cites *United States v. Wilbourn*, 799 F.3d 900 (7th Cir. 2015), but the reasoning of *Wilbourn* weighs in favor of a finding of probable cause here. Dkt. 21

9

at 6. In *Wilbourn*, there was no record of the arresting officers being informed about or involved in uncovering the facts supporting probable cause. 799 F.3d at 909. Here, unlike in *Wilbourn*, the evidence *does* show that Officers Beesley and Gonzalez "participated in the[ ] surveillance operations before they encountered" defendant; they were "present" when Individuals A and B were stopped, discovered to have drugs, and questioned; and they "derived their [further] suspicions as a result of facts provided to them by" Officer Hernandez. *Id.* As such, under the reasoning of *Wilbourn* and the other cases cited above, Officers Beesley and Gonzalez did have probable cause to arrest defendant based on their collective knowledge.

### B. Officers' Seizure and Search of the Durango was Permissible and Consistent with CPD Policy

Defendant next argues that even if officers had probable cause to arrest him, their search of his vehicle was improper because officers had no valid reason for impounding defendant's Durango and did not conduct the inventory search in accordance with CPD policies. Both arguments are without merit. Officers search of the vehicle was legal, both as an inventory search and a continuing search pursuant to the automobile exception.

Officers' impoundment and search of the Durango was well within the Fourth Amendment's bounds. "An inventory search is lawful if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *United States v.*

10

*Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010). "Both the decision to take the car into custody and the concomitant inventory search must meet the strictures of the Fourth Amendment." *Id.*

In this case, defendant was lawfully arrested, and his Durango was lawfully seized pursuant to multiple CPD policies and Chicago statutes. Specifically, CPD General Order G07-03 permits the towing of a vehicle related to arrest if "the vehicle has evidentiary value," "cannot be legally, securely, and continuously parked at the scene of the arrest; or the arrestee does not authorize another person to take control of the vehicle." Ex. J, CPD Directive 07-03 at I.G.1. Further, the Municipal Code of Chicago provides that "any motor vehicle that is used in connection with the . . . sale or attempt to sell, any controlled substance . . . shall be subject to seizure and impoundment." MCC § 7-24-225; *see also* Ex. K, CPD Special Order S07-03-05 (providing for impoundment in connection with sale of unlawful drugs).

Here, based on their observations, officers had probable cause to believe the Durango had evidentiary value, was used in connection with the sale of unlawful drugs, and was not safe to leave parked and unsecured on a public street, as it likely contained narcotics and other contraband. Officer Beesley testified that he removed the Durango for all those reasons. He properly impounded the vehicle pursuant to the above-discussed policies and to protect the public. *Bell v. City of Chi.*, 835 F.3d 736, 740–41 (7th Cir. 2016) (upholding MCC § 7-24-225 and holding it permits impoundment when "officer has probable cause to believe that a vehicle is subject to

seizure because it was used in some violation of law, here for having illegal drugs in it"); *United States v. Banks*, 628 F. Supp. 2d 811, 819 (N.D. Ill. 2009) (probable cause to impound vehicle pursuant to MCC § 7-24-225 where officers observed defendant arrive in vehicle to purchase drugs).

Defendant, citing *United States v. Duguay*, 93 F.3d 346 (7th Cir. 1996), claims the seizure of the car was improper because they should have allowed another person to take custody of the car. Dkt. 21 at 8) This argument fails for two reasons. First, unlike in *Duguay*, here officers had probable cause to believe the Durango itself had evidentiary value—namely, that it was an instrumentality of the offense and contained drugs—and those were reasons enough to seize the Durango rather than turn it over to someone else. Second, defendant claims that "alternatives were available" for taking custody of the car. Dkt. 21 at 8. But that is factually incorrect. Unlike in *Duguay*, here, the body worn camera and POD footage, as well as Officer Beesley's testimony, demonstrate that there was no passenger, no girlfriend present, and no other person available to take custody of the car. Ex. E 4:00-8:00; Def. Ex. D 10:00-01. Under these circumstances, the "police had no obligation to wait for someone else to arrive and take the keys." *United States v. Black*, No. 20-CR-247-1, 2023 WL 5934911, at *12 (N.D. Ill. Sept. 12, 2023) (J. Seeger).

Officer Beesley's subsequent inventory search of the Durango was also proper. "Warrantless inventory searches of automobiles in police custody do not violate the Fourth Amendment," so long as police "inventory search procedures [are] sufficiently

12

regulated to satisfy the Fourth Amendment." *United States v. Lomeli*, 76 F.3d 146, 148 (7th Cir. 1996). CPD has inventory procedures that are sufficiently regulated. Specifically, CPD Special Order S07-03-05 provides that if officers impound a vehicle, they must "remove and inventory personal property found within the vehicle. And CPD General Order G07-01 and Special Order 07-01 set forth the process for inventorying property taken into police custody. Courts in this District have consistently held that these CPD procedures satisfied the Fourth Amendment and denied motions to suppress related to CPD inventory searches. *See, e.g.*, *Banks*, 628 F. Supp. 2d at 820 (denying motion because CPD officers conducted proper inventory search pursuant to "customary procedures"); *United States v. Foston*, No. 17 CR 758, 2019 WL 1505412, at *4 (N.D. Ill. Apr. 5, 2019) (same where officer brought vehicle to station and conducted "vehicle inventory consistent with department policy").

Attempting to undercut these clear policies, defendant implies that Officer Beesley's search was improper because he had already conducted a brief search of the vehicle, did not record himself driving the Durango to the station, and only activated his body worn camera when he discovered the drugs and gun. Dkt. 21 at 4. But defendant does not cite to any procedure Officer Beesley violated. The fact that Officer Beesley conducted a brief initial search on the scene (which, as discussed below, was permissible) does not obviate the need for a more fulsome inventory search after the vehicle had been safely removed from the scene of the arrest. And in any event, the Seventh Circuit has held that "minor deviations from department policy do not render

13

an inventory search unreasonable." *Cartwright,* 630 F.3d at 616. As this Court held in responding to a similar argument, "it is not surprising that the loaded firearm garnered special attention," and the "fact that police could have done *more* does not mean that the police acted unlawfully when they did *less*." *Black*, 2023 WL 5934911, at *15. Further, "the failure to follow inventory procedures to a tee does not invalidate a search if the police would inevitably have found the gun through a lawful inventory search." *Id.* (citations omitted). Here, like in *Black*, "officers' decision to tow and impound the car was valid. As a result, the gun inevitably would have been discovered through an inventory search that complied with the City's policies." *Id.*

But aside from the inventory basis for the search, Officer Beesley's search was also legal under the automobile exception. Here, officers had observed defendant repeatedly engage in hand-to-hand transactions after exiting the Durango with baggies consistent with drugs in his hands. Officers had detained two purchasers and confirmed they had purchased drugs. Based on these facts, officers' initial search was legal under the automobile exception (and search incident to arrest exception) because officers had "probable cause to believe the vehicle contain[ed] contraband or other evidence of illegal activity." *United States v. Edwards,* 769 F.3d 509, 514 (7th Cir. 2014).

The Supreme Court has held that this exception is very broad and permits a search of a vehicle removed from the scene of arrest even if the search occurs as much as 8 hours after the arrest. *See Florida v Myers*, 466 U.S. 380 (1984). The Seventh

14

Circuit and courts in this district have similarly held that the automobile exception applies "even after [the car] has been impounded and is in police custody." *Carpenter v. United States*, No. 20 C 7359, 2024 WL 2019953, at *9 (N.D. Ill. May 7, 2024) (upholding search that found guns after car was towed to police station); *United States v. Matthews*, 32 F.3d 294, 299 (7th Cir. 1994) (same automobile exception applies even after vehicle is towed). Here, Officer Beesley searched the car within minutes after removing it from the street. This was a legal continuation of his probable cause search pursuant to the automobile exception.

### IV.  CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion to suppress.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

BY:  s/ Elie T. Zenner
ELIE T. ZENNER
Assistant U. S. Attorney
219 S. Dearborn
Chicago, Illinois 60604
(312) 697-4032

Dated: February 24, 2025

15